## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ARTURO ROMERO,

       **Plaintiff,**

       **v.**                                 **Case No. 2:24-CV-02134-JAR**

**KANSAS HEAVY CONSTRUCTION, L.L.C.,**

       **Defendant.**

---

### MEMORANDUM AND ORDER

Plaintiff Arturo Romero brought this action against his former employer, Defendant Kansas Heavy Construction, L.L.C., alleging age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), discrimination based on national origin in violation of Title VII of the Civil Rights Act of 1964, and retaliation in violation of Title VII. This matter is now before the Court on Defendant's Motion for Summary Judgment (Doc. 37). The motion is fully briefed, and the Court is prepared to rule. For the reasons stated below, the Court grants in part and denies in part Defendant's motion.

## I.    Page Limitation

Before addressing the merits of Defendant's motion, the Court directs the parties' attention to D. Kan. Local Rule 7.1(d)(2) which reads in relevant part: "Principal briefs in support of, or in response to, summary judgment . . . motions must not exceed 40 pages." Plaintiff's response to Defendant's motion is 124 pages—more than three times the limit set by the rule. Plaintiff did not seek or receive permission to exceed the 40-page limit. Defendant did not object to Plaintiff's rule violation, so the Court will, reluctantly, consider Plaintiff's response.

However, the Court advises both parties to review and comply with all applicable local and federal rules going forward.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1]  In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).

[5] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[7] *Anderson*, 477 U.S. at 256.

[8] *Id.*; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]
To accomplish this, the facts "must be identified by reference to an affidavit, a deposition
transcript or a specific exhibit incorporated therein."[10]  The non-moving party cannot avoid
summary judgment by repeating conclusory opinions, allegations unsupported by specific facts,
or speculation.[11]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it
is an important procedure "designed 'to secure the just, speedy and inexpensive determination of
every action.'"[12]

## III.    Uncontroverted Facts

The following facts are either uncontroverted or viewed in the light most favorable to
Plaintiff as the nonmoving party.

Plaintiff is a Hispanic male.  Defendant, a municipal road construction company owned
by Tom Giefer and Chris Gratton, hired Plaintiff as a concrete job finisher in June 2013.
Plaintiff was hired on the recommendation of Jeff Gragg who was a concrete superintendent for
Defendant at the time.  Gragg previously worked with Plaintiff at a different employer.  In 2016,
Giefer and Gratton promoted Plaintiff to foreman.  Plaintiff testified in his deposition that his
position was foreman/superintendent.[13]  Plaintiff's job duties included managing a concrete
crew; ordering and coordinating concrete delivery with suppliers; ensuring materials, equipment,
and tools arrive at the job site; dealing with municipalities' inspectors and engineers; and

---

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[10] *Adams v. Am. Guar. & Liab. Ins.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[11] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199) (10th Cir. 2006) (citations omitted).

[12] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[13] Doc. 40-1 at 31:7–13.

reporting to Giefer and Gratton.  The parties dispute whether Gragg was ever Plaintiff's supervisor.

Defendant employs hourly workers on a seasonal basis to work on its concrete crews. Each crew is supervised by a foreman.  At the close of each concrete season, which runs approximately March through November, hourly workers are laid off and then hired the following season.  Plaintiff, as a foreman, was a salaried employee.  During the off-season, a foreman performs little to no work but remains employed and paid his normal salary.

Defendant employs about 60 employees during the concrete season.  During the offseason, when hourly workers are laid off, the number drops to about 20 employees.  During concrete season, approximately 25 of Defendant's employees are Hispanic and about 27 are at least 45 years old.  Shortly after hiring Plaintiff, Defendant hired Plaintiff's cousin, Ramon Martinez, who is also Hispanic.  Martinez was initially a member of Plaintiff's concrete crew and was eventually promoted to foreman to run a separate crew.

During his deposition, Plaintiff testified about his relationship with Gragg and Gragg's alleged misconduct.  Plaintiff stated that he overheard Gragg "say things like . . . wetback, or stupid beaner, or stupid Mexican" to Hispanic employees.[14]  Plaintiff could only recall two instances where Gragg directed the racial slurs towards him: the first occasion in April 2020 related to a project in the City of Overland Park, Kansas and the second in May 2021 related to another Overland Park project.  Plaintiff also testified that Gragg would engage in "ass grabbing" with Hispanic employees where he would "come up to you from behind, [and] just grab you up from underneath in the ass."[15]  Plaintiff could only recall one instance where Gragg grabbed his

---

[14] *Id.* at 108:9–15.

[15] *Id.* at 95:19–20.

buttocks, but could not say if it happened three or four times.  Plaintiff testified that he witnessed Gragg "ass grab" his cousin Martinez on a couple of occasions and two other Hispanic employees on one occasion each.

On September 8, 2021, Gragg sent Plaintiff a text message complaining about Plaintiff's work performance.  Plaintiff made a complaint to Giefer regarding the text message.  During his deposition, Plaintiff testified that his complaint to Giefer did not allege that Gragg's text message was related to his race, national origin, or the color of his skin.  When Giefer spoke to Gragg about the text message, Gragg requested that Giefer remove Plaintiff from Gragg's project.  After visiting the job site the next day, Giefer and Gratton determined that Plaintiff and Gragg should not work together on the same job due to the conflict.  They moved Plaintiff to a different project that day.  Plaintiff did not work on a job with Gragg for the rest of his employment with Defendant.

Following Plaintiff and Gragg's separation, Gragg complained to Giefer that Plaintiff had not cleaned up a mess he left at a job site.  Giefer sent Plaintiff a text message asking Plaintiff to clean up the mess.  Plaintiff was in a truck with Gratton when he received Giefer's text message. Plaintiff told Gratton that the mess had been cleaned up weeks ago.  Plaintiff then informed Gratton that he wanted to file a harassment charge against Gragg.  Plaintiff did not communicate to Gratton that the alleged harassment was based on his race, national origin, or the color of his skin.  In his deposition, Plaintiff testified that Gratton responded by telling Plaintiff to "[d]o him a favor and wait until the end of the year" to file the harassment charge.[16]  At the time, Plaintiff understood Gratton's request to mean that Giefer and Gratton were finally going to "get rid of"

---

[16] *Id.* at 62:8–10.

Gragg or at least evaluate the conflict and take some kind of action.[17]  Gratton testified in his deposition that Plaintiff asked him what he and Giefer were going to do about Gragg and he replied that they would make adjustments after the season and keep Plaintiff and Gragg separated.

Plaintiff also testified at his deposition that he believed Gragg attempted to sabotage a concrete roundabout project he worked on by driving over the roundabout.  Plaintiff admitted that he had no basis to conclude Gragg did so, other than he believed that to be in Gragg's character.

On January 18, 2022, Defendant terminated Plaintiff's employment by text message from Giefer.  Plaintiff responded, "No worries I already knew that was coming.  Good luck."[18]  At the time, Giefer told Plaintiff he was being let go because Defendant was downsizing to one crew.  However, in their depositions, Giefer and Gratton testified that Plaintiff was let go because of his poor work performance, which, according to them, became a frequent issue in 2021.  Plaintiff's alleged poor work performance included issues with the quality of finishing concrete; lack of management; leaving jobs while his crew was working; using Defendant's equipment to perform unauthorized side jobs during work hours; damaging Defendant's equipment while performing side jobs; and failing to properly supervise his crew on a job for Overland Park, forcing Defendant to repair the work at a materials cost of approximately $28,000 plus the costs of employee wages, use of equipment, overhead, and lost revenue relating to other scheduled projects.  Giefer and Gratton never gave Plaintiff a write up or written discipline prior to his termination.  Giefer testified in his deposition that the decision to terminate Plaintiff's

---

[17] *Id.* at 62:11–22.

[18] Doc. 39-6.

employment was based solely on his and Gratton's personal observations and knowledge of Plaintiff's work performance. According to Giefer, he and Gratton did not rely on anyone else, including Gragg, in deciding to terminate Plaintiff's employment.

Giefer and Gratton both testified in their depositions that they decided to terminate Plaintiff's employment on December 10, 2021, but waited until January 18, 2022 "because [they] cared about [Plaintiff]"[19] and "so [Plaintiff] didn't have a hardship through the holidays for himself and his daughters."[20]

Following Plaintiff's termination, his cousin Martinez was the foreman of the remaining concrete crew. Giefer testified that Defendant viewed Plaintiff's termination as a downsizing because Plaintiff's crew was eliminated, even though Plaintiff was the only person from the crew currently on payroll due to it being the offseason. In the winter of 2022, Defendant issued its annual advertisement for hourly workers. The advertisement did not seek a concrete foreman or a replacement for Plaintiff. Instead, Defendant was looking to restaff some of the hourly positions it had laid off at the end of the previous season.

According to Gratton's declaration, Defendant did not realize that it needed a second concrete crew, and thus a second foreman, until bidding opportunities and prospective projects became available about two months after Plaintiff's termination. On March 15, 2022, Defendant decided to staff a second crew and promoted Jerry Sluder to the role of supervisor in training. Sluder was a white male who was in his mid-30s and is younger than Plaintiff. Sluder's responsibilities were not the same as Plaintiff's. Gratton took on some of the necessary functions of the role, including ordering materials and coordinating work for the concrete crew.

---

[19] Doc. 39-2 at 33:1–2.

[20] Doc. 39-1 at 30:2–4.

During Plaintiff's employment with Defendant, he never made a complaint to Giefer or Gratton regarding another employee's discrimination or adverse treatment toward him based on his race, national origin, or the color of his skin.  Plaintiff did make several complaints to Giefer about Gragg.  Giefer testified at his deposition that the complaints related to Gragg "getting on [Plaintiff] about not getting work done."[21]  Gratton characterized the conflicts between Gragg and Plaintiff as "fighting and bickering" among them because Gragg was "disappointed in [Plaintiff's] performance and lack of ability to do his job."[22]  Gratton is adamant that he never heard Gragg make a racial slur directed towards any Hispanic employees.  Further, Gratton is sure he never observed Gragg engaging in any inappropriate behavior of a sexual nature nor received any complaints from employees about Gragg engaging in such activity.

## IV.    Discussion

Defendant moves for summary judgment on all three of Plaintiff's claims: (1) age discrimination under the ADEA, (2) hostile work environment under Title VII, and (3) retaliation under Title VII.  The Court addresses each claim separately.

### A.    Age Discrimination

Count I alleges that Defendant discriminated against Plaintiff based on his age in violation of the ADEA.  Defendant argues that it is entitled to summary judgment on this count because Plaintiff cannot establish a presumption that his termination was based on his age.  Instead, Defendant argues that Plaintiff's poor and deteriorated work performance constituted a legitimate non-discriminatory basis for his termination.  The Court denies summary judgment on

---

[21] Doc. 39-2 at 17:2–3.

[22] Doc. 39-1 at 19:4–10.

this count because Plaintiff creates a genuine issue of material fact about whether Defendant's stated reason for terminating his employment is a pretext for discrimination.

The ADEA makes it unlawful for an employer to discriminate against an employee "because of such individual's age."[23]  A plaintiff can prove an ADEA claim through direct or circumstantial evidence.[24]  "[D]irect evidence demonstrates on its face that the employment decision was reached for discriminatory reasons."[25]  If Plaintiff lacks direct evidence of his age discrimination claim, the Court must apply the burden-shifting framework set out in *McDonnell Douglas v. Green*.[26]  Under this framework, Plaintiff "must first establish a prima facie case of discrimination."[27]  If Plaintiff meets his initial burden, the burden shifts to Defendant "'to articulate some legitimate, nondiscriminatory reason' for its action."[28]  Finally, if Defendant meets its burden, the Court must afford Plaintiff a fair opportunity to show that Defendant's stated reason was pretextual.[29]

Here, Plaintiff lacks direct evidence that Defendant terminated his employment because of his age.  Thus, the Court must apply the *McDonnell Douglas* framework to determine if there is sufficient circumstantial evidence.  First, the Court determines whether Plaintiff establishes a prima facie case of age discrimination.  In termination cases, such as this one, "the elements of a prima facie age discrimination case are typically that the plaintiff was '(1) within the protected class of individuals 40 or older; (2) performing satisfactory work; (3) terminated from

---

[23] 29 U.S.C. § 623(a).

[24] *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).

[25] *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (quoting *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002)).

[26] 411 U.S. 792 (1973).

[27] *Mauldin v. Driscoll*, 136 F.4th 984, 993 (10th Cir. 2025).

[28] *Id.* (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

[29] *Id.*

employment; and (4) replaced by a younger person, although not necessarily one less than 40 years of age."[30]  Defendant does not dispute that Plaintiff was over the age of 40, had his employment terminated, and was replaced by a younger person.  Therefore, the only element at issue is whether Plaintiff was performing satisfactory work.  In support of this element, Plaintiff cites evidence establishing that he never received a write up or written discipline prior to his termination.  Further, Plaintiff cites evidence establishing that Defendant never received any written complaints about his work from customers.  This evidence is sufficient to establish that Plaintiff performed satisfactory work.  Thus, because three of the four elements are not disputed, and Plaintiff put forth evidence establishing that he performed satisfactory work, he has met his light burden of establishing a prima facie case of age discrimination.[31]

Next, Defendant must articulate some legitimate, nondiscriminatory reason for terminating Plaintiff's employment.  "The defendant's burden is 'exceedingly light,' as its stated reasons need only be legitimate and non-discriminatory 'on their face.'"[32]  Here, Defendant offers two reasons.  The first reason, communicated to Plaintiff at the time of his termination, is that Defendant was downsizing to one crew and no longer needed two foremen.  The second reason, which Defendant articulated after Plaintiff brought this lawsuit, is that Plaintiff's work performance was poor.  Because both reasons are legitimate and nondiscriminatory on their face, Defendant has met its burden.

---

[30] *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1056 (10th Cir. 2020) (quoting *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136 (10th Cir. 2008)).

[31] *See Brainerd v. Schlumberger Tech. Corp.*, 589 F. App'x 406, 411 (10th Cir. 2015) (describing plaintiff's initial burden as a "light" one).

[32] *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (citations omitted).

Lastly, to survive summary judgment, Plaintiff must create a genuine issue of material fact as to whether Defendant's reasons for terminating his employment were pretextual.[33]  "A plaintiff may show pretext by demonstrating the 'proffered reason is factually false,' or that 'discrimination was a primary factor in the employer's decision.'"[34]  Pretext may be shown by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[35]  Plaintiff argues that both reasons proffered by Defendant are pretextual.  The Court agrees that Plaintiff has created a genuine issue of material fact as to both.

Plaintiff has created a genuine issue of material fact as to whether Defendant's first reason, downsizing to one crew, was pretextual.  It is undisputed that Defendant hired a new foreman at the beginning of the concrete season immediately following the termination of Plaintiff's employment.  Further, Plaintiff cites evidence that although Defendant did not promote Sluder until March 2022, it began looking for a new foreman on January 21, 2022—just a few days after terminating Plaintiff's employment.[36]  Finally, Plaintiff argues that downsizing must have been a pretext since Defendant has been inconsistent in its reason for terminating Plaintiff's employment, now claiming it was due to Plaintiff's poor work performance.  Viewing the evidence and all reasonable inferences in the light most favorable to Plaintiff, the Court

---

[33] *McIntosh v. Metro. Tulsa Transit Auth.*, 176 F. App'x 932, 934 (10th Cir. 2006).

[34] *Id.* (first quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2017); and then quoting *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1194 (10th Cir. 2016)).

[35] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006).

[36] Defendant states that the document Plaintiff relies on for this fact, Exhibit 8 to Plaintiff's deposition (Doc. 40-4), was not produced in discovery or attested to.  However, Defendant does not move to exclude by making the requisite showing under Fed. R. Civ. P. 37(c) or explain why the document could not be submitted in a form that would be admissible at trial.  *See Argo*, 452 F.3d at 1199.  Thus, the Court will consider the document. The Court notes it would ultimately reach the same conclusion without consideration of the document.

concludes that Plaintiff has created a genuine issue of material fact with respect to Defendant's first reason for termination being pretextual.

Plaintiff also argues that Defendant's second reason, poor work performance, was pretextual. Plaintiff contends that this second reason is pretextual because (1) it was different from the reason Giefer provided when he terminated Plaintiff's employment and was not communicated to Plaintiff until after he filed this lawsuit, and (2) he performed satisfactory work and therefore could not have been terminated for poor work performance. To support this contention, Plaintiff relies in part on his own deposition testimony that he was never counseled by Giefer or Gratton regarding his work performance. The Court agrees with Plaintiff that, viewing the evidence and all reasonable inferences in the light most favorable to Plaintiff, he has created a genuine issue of material fact with respect to Defendant's second reason for termination being pretextual.

Because Plaintiff has satisfied both of his burdens under the *McDonnell Douglas* burden shifting framework, Defendant's motion for summary judgment on Count I is denied.

### B. Discrimination Based on National Origin

Count II alleges that Defendant discriminated against Plaintiff based on his national origin by creating a hostile work environment in violation of Title VII. Defendant argues that it is entitled to summary judgment on this claim because any racial slurs and inappropriate sexual conduct directed at or witnessed by Plaintiff was infrequent, and because Plaintiff never made his supervisors aware of the hostile work environment. The Court agrees that Plaintiff never made his supervisors aware of any discrimination or hostile work environment based on race or national origin and thus grants Defendant's motion for summary judgment on Count II.

Title VII makes it unlawful for an employer to discharge or discriminate against an employee based on his race, color, or national origin.[37]  "This includes an employee's claims of a hostile work environment based on race or national origin discrimination."[38]  To survive summary judgment on a claim alleging a hostile work environment based on race or national origin, Plaintiff "must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" and that Plaintiff "was targeted for harassment because of [his] race or national origin."[39]  "The applicable test for a hostile work environment has both objective and subjective components."[40]  The Court must consider "both whether [Plaintiff] was offended by the work environment and whether a reasonable person would likewise be offended."[41]  Both must be proved.[42]  In determining whether a work environment is hostile, courts look at factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[43]

### 1. Alleged Misconduct

Plaintiff testified at his deposition that Gragg directed racial slurs towards him on two occasions: (1) in April 2020, Gragg called him a "stupid Mexican," and (2) in May 2021, Gragg

---

[37] 42 U.S.C. § 2000e-2(a).

[38] *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012) (quoting *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007)).

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

called him a "wetback."  In *Chavez v. New Mexico*, the Tenth Circuit explained that two racially offensive remarks "fall far short of the 'steady barrage' required for a hostile environment claim."[44]  But there, the court noted that Plaintiff did not even clarify whether one of the remarks, "clica," was a derogatory term for a clique of Hispanic individuals or simply the Spanish translation for "clique."[45]  Here, it is clear that the terms Gragg allegedly directed at Plaintiff are derogatory.[46]  Plaintiff also testified at his deposition that he overheard Gragg direct slurs like "wetback," "stupid beaner," and "stupid Mexican" at other Hispanic crew members.  Plaintiff said that Gragg used these slurs throughout his employment and whether he used them at least once a week "depended on what mood he's in."[47]

Next, Plaintiff alleges that Gragg grabbed his buttocks on at least one occasion and grabbed his coworkers' buttocks on a few occasions.  Even assuming this conduct is sufficiently severe since it involves physical touching, it is unclear whether this conduct was sufficiently pervasive.  Plaintiff only recalled five occasions of Gragg engaging in this conduct: one occasion when Gragg grabbed his buttocks, two occasions when he observed Gragg grab his cousin's buttocks, and two occasions when he observed Gragg grab the buttocks of two employees who Plaintiff could not identify by name.  Moreover, Plaintiff has not presented any evidence establishing that Gragg grabbed certain employees' buttocks *because of* their race or national origin.

---

[44] 397 F.3d 826, 832 (10th Cir. 2005).

[45] *Id.*

[46] *See Rocha Vigil v. Las Cruces*, 119 F.3d 871, 874 (10th Cir. 1997) (Lucero, J., dissenting) (citations omitted) ("The term 'wetback' is severely degrading.  Accordingly, its use hardly needs to be pervasive for a Hispanic employee to find her work environment hostile and abusive-*and reasonably so*.").

[47] Doc. 40-1 at 235.

Plaintiff also argues that a text message Gragg sent him contributed to a hostile work environment. Plaintiff describes this text message as "insulting" and "crude."[48] However, in the text message Gragg simply complains about Plaintiff's work performance and does not reference or allude to Plaintiff's, nor anyone else's, race or national origin.

Finally, Plaintiff alleges that Gratton and Defendant's secretary contributed to a hostile work environment. Plaintiff testified at his deposition that Gratton did so by speaking to Mexican employees in a degrading manner, using Spanish words like "amigo," "andale," and "martillo" (Spanish for hammer). But Plaintiff does not explain how these seemingly innocuous phrases contributed to a hostile work environment.[49] Even if Plaintiff was offended by the comments, he has not made clear why a reasonable person would likewise be offended. And Plaintiff argues that Defendant's secretary contributed to a hostile work environment when she sent Plaintiff a text message that said, "the stupid Mexicans were back."[50] Plaintiff did not provide any additional context for this text message.

### 2. Totality of the Circumstances

In determining the existence of discrimination based on national origin, the Court must consider the totality of the circumstances to determine whether the alleged misconduct was sufficiently severe or pervasive.[51] "Although the test is phrased in the disjunctive, severity and

---

[48] Doc. 40 at 120.

[49] *See Faragher v. Boca Raton*, 524 U.S. 775, 788 ("'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (citations omitted)); *Reynaga v. Sun Studs, Inc.*, 27 F. App'x 740, 743 (9th Cir. 2001) ("The discriminatory comments heard by Reynaga were either too innocuous (in the case of being called 'amigo') . . . to create a 'hostile or abusive' workplace.").

[50] Doc. 41-1:6–8.

[51] *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1539 (10th Cir. 1995).

pervasiveness are interdependent: The more severe the conduct, the less pervasive it needs to be; the more pervasive, the less severe."[52]

Viewing the facts in the light most favorable to Plaintiff, a rational jury could likely find that the workplace was permeated with discriminatory intimidation, ridicule, and insult based on Gragg's alleged frequent use of derogatory phrases and the text message Plaintiff received from the secretary. As noted above, Gragg's use of slurs like "wetback" is extremely severe. And, according to Plaintiff's deposition testimony, Gragg used slurs like this throughout Plaintiff's employment, directing them at Plaintiff and other employees. "Evidence of hostility directed at coworkers may support a hostile work environment claim if a plaintiff is aware of those incidents when [he] was allegedly subject to a hostile work environment."[53] It is reasonable to infer that Plaintiff was offended by the work environment based on his many complaints to Giefer about Gragg. And it can be inferred that any reasonable Hispanic employee would be offended if racial slurs were directed at him and other Hispanic employees throughout their employment.

Thus, the Court finds that after considering the totality of the circumstances, Plaintiff's testimony regarding Gragg and the secretary's use of these derogatory phrases has created a genuine issue of material fact as to whether the workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to create a hostile work environment. But regardless, his claim cannot survive summary judgment because Defendant did not know, and could not have reasonably known, about Gragg's alleged misconduct.

---

[52] *Fye v. Okla. Corp. Comm'n*, 175 F. App'x 207, 210 (10th Cir. 2006).

[53] *Ridgell-Boltz v. Colvin*, 565 F. App'x 680, 685 (10th Cir. 2014).

### 3. Defendant's Knowledge

Defendant suggests that it cannot be liable under a hostile work environment theory because Giefer and Gratton, "who [Plaintiff] identifies as his direct supervisors were not aware of the alleged comments from Gragg."[54] The Court agrees. Plaintiff has not created a genuine issue of material fact as to Giefer or Gratton's knowledge of Gragg's alleged misconduct. Further, Plaintiff has not created a genuine issue of material fact as to whether Gragg was Plaintiff's supervisor.

An employer's liability for a hostile work environment claim under Title VII depends on the status of the harasser.[55] In *Vance v. Ball State University*, the Supreme Court explained:

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.[56]

Here, if Gragg, the alleged harasser, was merely Plaintiff's co-worker, and not Plaintiff's supervisor, Defendant would not be liable under Title VII because Plaintiff has not established that Defendant was negligent in controlling working conditions. An employer is negligent in controlling working conditions when it knew or should have known about the relevant conduct and failed to stop it.[57] Plaintiff fails to create a genuine issue of material fact as to whether

---

[54] Doc. 38 at 22.

[55] *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).

[56] *Id.*

[57] *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998).

Defendant knew or should have known about Gragg's alleged discrimination based on race or national origin. None of the evidence cited by Plaintiff, even viewed in the light most favorable to him, suggests that Giefer or Gratton knew about Gragg's alleged use of racial slurs or other relevant misconduct. Plaintiff made several complaints to Giefer and Gratton about Gragg, but none of the complaints alleged that Gragg used racial slurs or otherwise engaged in discrimination. And Plaintiff has not presented evidence that Giefer or Gratton personally witnessed Gragg use racial slurs. Nor has Plaintiff presented evidence establishing that Giefer or Gratton reasonably should have known about Gragg's alleged relevant misconduct. It is unreasonable to expect owners of a construction company to know everything that goes on at every job site. This is especially true when the foreman, Plaintiff, who the owners tasked with reporting to them and managing the concrete crew, did not notify them of the racial slurs directed at him and his crew.

Moreover, Defendant cannot be held liable under the theory that Gragg was Plaintiff's supervisor because, for purposes of Defendant's liability under Title VII, he was not. The parties dispute whether Gragg was Plaintiff's supervisor. Plaintiff testified at his deposition that Gragg was not his supervisor and that they had the same job titles, but now argues that Gragg was his supervisor. Conversely, Giefer and Gratton both testified at their depositions that Gragg was Plaintiff's supervisor, but Defendant now takes the position that they were equals. However, formal job titles within an organization have no bearing on whether an employee is a supervisor for Title VII purposes.[58] Instead, an employee is a "supervisor" for purposes of vicarious liability under Title VII "when the employer has empowered that employee to take tangible

---

[58] *See Vance*, 570 U.S. at 431; *see also Stewart v. MTR Gaming Grp., Inc.*, No. 5:12-CV-66, 2015 WL 12085873, at *3 (N.D.W. Va. July 21, 2015) ("The *Vance* Court adopted a definition of supervisor that disregards job title . . . .").

employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[59]

Here, Plaintiff has not created a genuine issue of material fact as to whether Gragg was his supervisor. Plaintiff has not presented any evidence suggesting that Gragg had the authority to hire, fire, promote, or reassign him, or to make any decisions that could cause a significant change in his benefits. Plaintiff concedes that although Gragg knew him from a previous job, it was Gratton who hired him on Gragg's recommendation, suggesting that Gragg did not have the authority to hire Plaintiff himself. It is also clear from the evidence that Plaintiff was fired by Giefer, not Gragg. This is true despite Gragg sending Plaintiff a text message telling him he never wanted to work with him again and telling him to find somewhere else to work, which suggests that Gragg would have fired him if he could. Moreover, it was Giefer and Gratton that determined that Plaintiff and Gragg should be separated; the most Gragg could do was request that they not work together.

Thus, while the Court does not condone the use of racially offensive slurs, comments, or phrases, it must grant Defendant's motion for summary judgment on Count II. Plaintiff has not presented any facts or evidence establishing that Giefer or Gratton knew or reasonably should have known about the relevant misconduct or that Gragg was Plaintiff's supervisor.

### C. Retaliation

Count III alleges that Defendant retaliated against Plaintiff in violation of Title VII. Defendant argues that it is entitled to summary judgment on this count because Plaintiff did not engage in protected activity and there is no causal connection between any alleged protected

---

[59] *Vance*, 570 U.S. at 431.

activity and the termination of Plaintiff's employment.  The Court agrees with Defendant and grants its motion for summary judgment on Count III.

Title VII makes it unlawful to retaliate against an employee because the employee opposed an employment practice made unlawful by Title VII, or because the employee "participated . . . in an investigation, proceeding, or hearing."[60]  To prevail on a Title VII retaliation claim, Plaintiff "may offer direct evidence that retaliation played a 'motivating part' in the adverse employment decision."[61]  Alternatively, in the absence of direct evidence of retaliation, the court assesses retaliation claims under the *McDonnell Douglas* burden-shifting framework.[62]  Again, under that framework, Plaintiff has the initial burden of establishing a prima facie case for retaliation.[63]  Then, Defendant has the burden to articulate a legitimate, nondiscriminatory and nonretaliatory reason for the adverse action.[64]  Finally, Plaintiff has the burden to show there is a genuine issue of material fact as to whether Defendant's proffered reason is pretextual.[65]

Here, Plaintiff does not offer direct evidence of Defendant's retaliation.  Therefore, the *McDonnell Douglas* framework applies.  To state a prima facie Title VII retaliation claim, Plaintiff must show "(1) that [he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[66]

---

[60] 42 U.S.C. § 2000e-3(a).

[61] *Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016).

[62] *Id.*

[63] *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017).

[64] *Id.*

[65] *Id.*

[66] *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012)).

Plaintiff cannot satisfy his initial burden of establishing a prima facie case for retaliation because, as Defendant argues, he did not engage in protected opposition to discrimination or any other protected activity.  Plaintiff's complaints to Gratton regarding Gragg's conduct were not protected activity under Title VII because, as discussed above, Plaintiff did not attribute any of the alleged mistreatment to his race or national origin.  In his deposition, Plaintiff admitted that he did not tell Gratton that Gragg was harassing him based on his race or national origin.[67] Moreover, the text message that Gragg sent Plaintiff, which immediately preceded Plaintiff's complaint to Gratton, did not reference race or national origin.  Plaintiff does not argue that he engaged in protected activity other than his complaint to Gratton regarding Gragg's alleged mistreatment.

As the Tenth Circuit explained, "a vague reference to discrimination and harassment without any indication that this misconduct was motivated by race (or any category protected by Title VII) does not constitute protected activity and will not support a retaliation claim."[68] "[T]he absence of a reference to unlawful discrimination . . . can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII."[69]  Thus, Plaintiff cannot satisfy the first element of a prima facie retaliation claim.  Nor can Plaintiff satisfy the third element since it also requires the existence of a protected act by Plaintiff.  Accordingly, the Court grants Defendant's motion for summary judgment on Count III.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 37) is **granted in part and denied in part**.  Defendant's motion for

---

[67] Doc. 39-5 at 62:1–5.

[68] *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004).

[69] *Iweha v. Kansas*, 121 F.4th 1208, 1234 (10th Cir. 2024).

summary judgment with respect to Count I is **denied**.  Defendant's motion for summary

judgment with respect to Counts II and III is **granted**.

      **IT IS SO ORDERED.**

    Dated: <u>August 6, 2025</u>

<u>s/ Julie A. Robinson</u>
Julie A. Robinson
United States District Judge
